## LUKOS
### v.
## CHESAPEAKE & O. RY. CO.
Civ. A. No. 1754.

United States District Court,
W. D. Michigan, S. D.
April 2, 1954.

---

Marcus, McCroskey & Finucan, Thos. W. Finucan, Muskegon, Mich., for plaintiff.

Wm. R. Althans, Robert A. Straub, Detroit, Mich., Harrington, Waer, Cary & Servaas, John C. Cary, Grand Rapids, Mich., for defendant.

STARR, District Judge.

In his complaint the plaintiff alleges that on October 12, 1950, while performing his assigned duties aboard the defendant's vessel, City of Midland, steamer No. 41, he sustained severe and permanent injuries when he was caused to fall to the deck of the vessel while carrying a large and heavy piece of the vessel's gear, without proper assistance, aid, and supervision. He further alleges that at the time of his injury he was in the employ of the defendant in the capacity of a seaman and was a member of the crew aboard the defendant's vessel, which was engaged in commerce and navigation on the Great

Lakes. He contends that as a seaman and member of the crew he is entitled to maintain this action under the Jones Act, 46 U.S.C.A. § 688.

In his complaint the plaintiff sets forth three causes of action. In his first cause of action he charges the defendant with negligence, in that it:

"(1) Failed to provide a safe and worthy vessel and appliances and to keep same in a safe condition;

"(2) Failed to furnish plaintiff with a safe place to work;

"(3) Failed to furnish plaintiff with seaworthy tools and appliances and to maintain same in a safe and proper condition;

"(4) Failed to furnish plaintiff with reasonably competent co-employees and officers and with a sufficient number of same;

"(5) Failed to provide plaintiff with proper and adequate supervision and assistance in the performance of his assigned duties;

"(6) Failed to promulgate and enforce proper and safe rules for conduct and performance of assigned duties and to warn plaintiff of any dangers to be encountered therein;

"(7) Ordered plaintiff to do hazardous work in foul and inclement weather and upon rough seas when such work was not necessary to the safety of the aforesaid vessel and its crew;

"(8) Failed to provide a clear and safe passageway for plaintiff and his fellow-workmen and members of the crew to move about in the course of his and their assigned duties; and,

"(9) Failed to exercise ordinary care for plaintiff's health and safety."

In his first cause of action plaintiff claims damages for past and future pain and suffering and loss of earnings, and for past and future hospital, medical, and surgical care and treatment. In his second and separate cause of action based upon the same allegations of negligence on the part of the defendant, he claims damages for defendant's alleged failure to furnish him with necessary and proper medical and hospital care, and he alleges that defendant's failure to furnish such medical and hospital care aggravated his condition and injuries and caused him increased and additional pain, suffering, disability, and loss of earnings. In his third and separate cause of action based upon the same charges of negligence, he claims damages for wages and for maintenance and cure during his disability.

The defendant has answered denying the right of the plaintiff to recover under any of the alleged causes of action, and as affirmative defenses it contends, among other things: (1) That the court does not have jurisdiction of the subject matter of this action, and (2) that the subject matter of the action is "peculiarly within the scope of Longshoremen's and Harbor Workers' Compensation Act, Title 33, U.S.C.A. § 901, et seq."

The parties have agreed that the question as to whether the plaintiff is entitled to maintain this action under the Jones Act or whether he must seek relief under the Longshoremen's Act shall be determined in advance of the trial of the case on the merits. The parties have filed a stipulation of facts, a copy of which is attached hereto marked "Appendix A," and have agreed that these stipulated facts may be considered by the court in determining whether or not plaintiff's employment status entitles him to maintain this action under the Jones Act. Counsel for the parties have filed extensive and capable briefs in support of their respective contentions. It is clear that the controlling question presented for determination is whether the plaintiff was a "seaman-member of the crew" aboard the defendant's vessel at the time of his injury.

The Jones Act, 46 U.S.C.A. § 688, provides in part as follows:

"Any seaman who shall suffer personal injury in the course of his

employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply".

The Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 903, 905, provides in part as follows:

"§ 903. (a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law. No compensation shall be payable in respect of the disability or death of—

"(1) A master or *member of a crew of any vessel,* nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net".

"§ 905. The liability of an employer prescribed in section 904 of this chapter shall be exclusive and in place of all other liability of such employer to the employee".

■ It should be noted that the above-quoted provision of the Longshoremen's Act excludes a "member of a crew of any vessel". In Swanson v. Marra Bros., Inc., 328 U.S. 1, at page 7, 66 S.Ct. 869, at page 872, 90 L.Ed. 1045, the Supreme Court of the United States said: "We must take it that the effect of these provisions of the Longshoremen's Act is to confine the benefits of the Jones Act to the members of the crew of a vessel plying in navigable waters". Therefore, to maintain the present action under the Jones Act, the plaintiff must establish that at the time of his injury he was a "seaman" and a "member of the crew" on the defendant's vessel.

A review of the many authorities indicates that there has been considerable difficulty and confusion in determining, under the particular facts and circumstances in each case, whether the employee was entitled to maintain an action for damages under the Jones Act, or an action for the benefits provided by the Longshoremen's Act. In the case of Petition of Spearin, Preston & Burrows, Inc., 2 Cir., 190 F.2d 684, at page 687, the court said: "The cases dealing with the question of whether or not a given person is or is not 'a member of a crew' are legion. They turn on individual fact situations and nothing can be gained by reviewing them here."

■ The term "seaman" is defined in Federal statutes, 24 U.S.C.A. § 1 (now repealed), 42 U.S.C.A. § 201, and 46 U.S.C.A. § 713. However, examination of these statutory definitions clearly indicates that they are limited to the specific statutory acts of which they are a part, and that they were not intended to be used and cannot properly be used as controlling definitions under the Jones Act. In his brief the plaintiff contends that the courts, in construing the rights of an employee under the general maritime law, have always given the term "seaman" a liberal interpretation. See Isbrandtsen Co., Inc. v. Johnson, 343 U.S. 779, 782, 72 S.Ct. 1011, 96 L.Ed. 1294; Aguilar v. Standard Oil Co. of New Jersey, 318 U.S. 724, 729, 63 S.Ct. 930, 87 L.Ed. 1107; The Arizona v. Anelich, Adm'x, 298 U.S. 110, 123, 56 S.Ct. 707, 80 L.Ed. 1075. See also "Seamen as Wards of the Admiralty," Vol. 52 Mich.L.Rev. pp. 479–504 (Feb. 1954). In 48 Am.Jur. § 144, pp. 99, 100, it is stated:

"A seaman has been defined broadly as a person whose occupation is to assist in the management of vessels at sea. Although the term originally included only common sailors, the status and rights of seamen, under the ruling of American courts, from time to time have been extended to persons performing maritime services of various

sorts, such as mates, pilots, pursers, surgeons, stewards, engineers, cooks, clerks, carpenters, firemen, deck hands, porters, chambermaids, seal hunters and fishermen on sealing and fishing vessels, and in general all hands employed on the vessel in furtherance of the main object of the enterprise in which she is engaged."

On the other hand, the defendant contends that prior to the passage of the Longshoremen's Act the term "seaman" was given a broad interpretation in order that employees classified as seamen would be entitled to proceed under the Jones Act, because otherwise they would have been entirely without protection. However, in Frankel v. Bethlehem-Fairfield Shipyard, Inc., D.C., 46 F.Supp. 242, 249, the court said:

"Prior to the passage of the Longshoremen's Act in 1927 the courts gave a very liberal interpretation to the term 'seaman' including therein, for instance, a laborer acting as a stevedore * * *. International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157. But the coverage of the Longshoremen's Act included all maritime employes except the 'master or member of a crew of any vessel', 33 U.S.C.A. § 903(a)(1), and, being an exclusive compensation act, now necessarily limits the scope of 'seaman' in the Jones Act to a maritime employe who can be considered the master or member of the crew of a vessel. Subject to this limitation the rule of interpretation of who is a seaman is still liberal. Warner v. Goltra, 293 U.S. 155, 55 S.Ct. 46, 79 L.Ed. 254; Nogueira v. New York, N. H. & H. R. Co., 281 U.S. 128, 50 S.Ct. 303, 74 L.Ed. 754; South Chicago C[oal] & D[ock] Co. v. Bassett, 309 U.S. 251, 257, 60 S. Ct. 544, 84 L.Ed. 732; and cases collected in Robinson, Admiralty, p. 318 et seq."

As hereinbefore stated, to maintain this action under the Jones Act the plaintiff must establish his status as a seaman and member of the crew on the defendant's vessel. The question as to whether a maritime employee is a seaman and a member of the crew is primarily one of fact to be determined under the particular facts and circumstances in each case. McKie v. Diamond Marine Co., 5 Cir., 204 F.2d 132. However, the courts have not always used the terms "seaman" and "member of the crew" with the utmost precision. The appellate court of this judicial circuit in Wilkes v. Mississippi River Sand & Gravel Co., 6 Cir., 202 F.2d 383, has indicated the several tests for determining whether a maritime employee is entitled to proceed under the Jones Act. The court said, 202 F.2d at pages 387, 388:

"The question of whether a certain claimant is a 'master or member of a crew' is primarily a question of fact; but the Supreme Court has said that the 'word "crew" does not have an absolutely unvarying legal significance.' South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 257, 60 S.Ct. 544, 547, 84 L.Ed. 732. * * *

"It must constantly be borne in mind that these suits were brought under the Jones Act and the facts found must be viewed in the light of the requirements of that remedial statute, the legislative history of which discloses the Congressional intent that it should be construed liberally. See Carumbo v. Cape Cod S. S. Co., 1 Cir., 123 F.2d 991, 995, and cases there cited. On page 995 of 123 F.2d, the Carumbo opinion, the court said: 'The process of liberal construction of the Jones Act cannot now be ignored because Congress has seen fit to pass the Longshoremen's Act.' * * *

"It would seem that the several tests under the Jones Act should be as derived from the cases of South Chicago [Coal & Dock] v. Bassett, supra; Norton v. Warner Co., supra [321 U.S. 565, 64 S.Ct. 747, 88

L.Ed. 931]; Maryland Casualty Co. v. Lawson, 5 Cir., 94 F.2d 190; A. L. Mechling Barge Line v. Bassett, 7 Cir., 119 F.2d 995; Carumbo v. Cape Cod S. S. Co., supra; and as set forth in Rackus v. Moore-Mc-Cormack Lines, Inc., D.C., 85 F. Supp. 185, namely: (1) that the vessel be in navigation; (2) that there be more or less permanent connection with the vessel; and (3) that the worker be aboard primarily to aid in navigation.

"Applying these requirements to the instant facts, it appears that only the third requirement (that the worker be aboard primarily to aid in navigation) is the source of confusion. A review of the cases supports our conclusion that 'aiding in navigation' is not confined to those who can 'hand, reef and steer,' but applies to all whose duties contribute to the operation and welfare of the vessel. See Norton v. Warner Co., supra (citing Judge Hough's opinion in The Buena Ventura, D.C., 243 F. 797). It has been held that a person is aiding in navigation, though he happens to be a cook. A. L. Mechling Barge Line v. Bassett, supra. See, especially, Kibadeaux v. Standard Dredging Co., 5 Cir., 81 F.2d 670, certiorari denied 299 U.S. 549, 57 S.Ct. 12, 81 L.Ed. 404. * * *

"In our judgment, an employer who hires men to work on the water on vessels engaged in navigation and permits them to have such a permanent connection with the vessel as to expose them to the same hazards of marine service as those shared by all aboard should not be permitted, by merely restricting their duties or by adopting particular nomenclature as descriptive of their tasks, to limit his liability to such employees, in the event of disability or death alleged to have been caused by the negligence of the employer, to the extent prescribed by the Longshoremen's Act."

The present question as to whether plaintiff was a seaman-member of the crew and entitled to proceed under the Jones Act must be determined on the basis of the stipulated facts. The stipulation indicates that the major part of the work done by plaintiff and others, who are referred to as marine laborers, was done on board the vessel, City of Midland, and other ships in the defendant's fleet while they were in actual navigation; that plaintiff and other marine laborers were engaged in scrubbing and cleaning the vessel's decks and engine room, doing general cleaning work about the vessel, chipping and painting the masts, scrubbing, scraping, and painting life boats, cleaning boiler grates, and cleaning and painting the several vessels in defendant's fleet. On some occasions they were aided in their work by the deck hands and members of the regular crew of the vessel. Although plaintiff and other marine laborers were in charge of a labor foreman, they were, nevertheless, under the general supervision of the mate of the vessel. It also appears that during the working days of Monday through Friday of each week the plaintiff and other marine laborers were assigned to quarters and ate and slept aboard the vessel. At no time while in defendant's employ did plaintiff Lukos work on a vessel which was completely withdrawn from navigation. The courts have generally held that those who handle and deal with the cargo of a ship come under the Longshoremen's Act, and it is significant that in the present case plaintiff had no concern with the cargo. In 54 C.J.S., Longshoreman, p. 795, a longshoreman is defined as "a laborer employed about the wharves of a seaport, especially in loading and unloading vessels." Plaintiff Lukos certainly does not fall within this definition of a longshoreman.

It has generally been held that navigation is not limited to "putting over the helm" and that "members of the crew" are not confined to those who "hand, reef, and steer." Therefore, it seems clear that the type of work performed

by plaintiff and other marine laborers on the defendant's vessels was such as has traditionally been done by seamen and members of the crew and can properly be considered in aid of navigation. See Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931. The fact that plaintiff and other marine laborers did not remain on board ship during weekends, or that they were on a separate payroll, or that their hours were different from those of other vessel personnel, will not bar plaintiff from classification as a seaman-member of the crew.

The pleadings and stipulation of facts indicate: (1) That the defendant's vessel on which plaintiff was injured was in navigation on Lake Michigan; (2) that the vessel was a large, self-propelled vessel, "over eighteen tons net," operating in interstate commerce; (3) that the principal part of plaintiff's work was done while the vessel was in actual navigation; (4) that plaintiff worked, ate, and slept aboard the vessel and was exposed to the hazards and perils of the sea; (5) that the work performed by him was the work usually and traditionally performed by seamen-members of the crew; (6) that the work performed by him was in aid of navigation; and (7) that plaintiff did no work and had no connection whatever with the cargo of the vessel.

Therefore, the court concludes that at the time he was injured, plaintiff John Lukos was a "seaman" and "member of the crew" aboard defendant's vessel, City of Midland, steamer No. 41, and that he is entitled to maintain the present action for damages under the Jones Act.

### Appendix A

#### Stipulation of Facts

1. Defendant's marine organization, with headquarters at Ludington, Michigan, under the general supervision of L. H. Kent, Superintendent, maintains on a permanent basis a group of ten employees classified as marine laborers.

2. The marine laborers, so-called, are employed for general cleaning work, to wit, scrub and clean decks and bulkheads; scrub and clean in the vessel's engine room; chip and paint the mast; scrub, scrape, and paint life boats; and clean grates of boilers. The marine laborers have no duties with relation to the vessel's cargo or freight. On some occasions, the marine laborers are supplemented or aided in their work by "deck hands."

3. The marine laborers are commonly called and known as the "marine labor gang" and are under the supervision of Foreman Samuel R. Stock.

4. The marine labor gang performs its work on board ships of defendant's Lake Michigan fleet, on the ships' gear, whether it be on the ships or in the shore workshops, and on the buildings maintained by the marine organization on shore. Defendant's ships comprise the largest segment of its marine organization, and, therefore, more labor is expended on cleaning and painting the ships than on shore establishments. Consequently, the marine labor gang spends a great majority of its time in cleaning and painting defendant's ships. With the exception of four days spent in shore work, all of John Lukos' work performed for defendant during the course of his employment was performed upon defendant's vessels.

5. The marine labor gang works on defendant's ships while they are under way, moored to the pier, or completely removed from service, depending upon what part of the ship the work is to be done and the time when it must be done. At no time while in defendant's employ did John Lukos work on a vessel which was completely withdrawn from service.

6. Due to the general weather conditions, most of the painting and cleaning is done during the summer months and, for this reason, four additional marine laborers are employed from April 15 to October 15, increasing the marine labor gang to fourteen men.

7. The marine laborers are not represented by any labor union, and they are not issued seamen's cards or continuous discharge books. All other per-

sonnel aboard defendant's ships are represented by various labor unions, depending upon the craft of the individual employee. The other personnel working aboard defendant's ships are issued seamen's cards by the U. S. Coast Guard.

8. When the services of the marine laborers are required, the Superintendent's office issues work orders to Samuel R. Stock, foreman of the marine labor gang, designating the various cleaning and painting jobs to be done. The foreman, in turn, assigns a certain number of marine laborers to do the job under the supervision of one of their number. This latter person is charged with the duty of seeing that the job is completed and keeping the time cards of the marine laborers working for and with him.

9. When the assigned job of cleaning and painting is aboard ship the marine laborer in charge takes the marine laborers aboard ship, reporting the assignment to the mate on duty. In order to avoid a conflict in working areas, the marine laborer in charge checks with the mate, usually daily, to see that no more than one working party is engaged in a given area at the same time. The marine laborer also checks with the mate to determine whether or not foul weather will interfere with the proposed work area.

10. The mate usually initials the time slips prepared by the marine laborer in charge to verify the fact that the marine laborers are on board and are working. In addition, the mate inspects the work to see that it is done.

11. If the area in which the marine laborers propose to work is to be used by a work party of other personnel working aboard the vessel, or will be subject to foul weather, the mate has the authority to change the marine laborers' work area.

12. The marine laborers have no fire or lifeboat stations, nor are they required to attend fire and lifeboat drills. The other personnel are assigned fire and lifeboat stations and are required to attend fire and lifeboat drills.

13. The marine laborers leave the ship each Friday noon or evening when it arrives in Ludington, remaining ashore over the week end until Monday, when they return aboard either in the morning or at noon when the ship comes into port. The marine laborers do not have the privilege of remaining on board ship during the week ends.

14. The marine laborers work a straight forty-hour week during the daylight hours, usually from 7:30 a. m. to 4:30 p. m., Monday through Friday. The hours worked per day varies slightly to adjust for embarking or disembarking late or early, as the case may be, on Fridays and Mondays. Other persons aboard the vessel stand continuous watches of four hours on duty and eight hours off, with the exception of the stewards department, which works any eight hours in a twelve-hour period, to accommodate passenger, food, and lodging requirements.

15. During the weekdays, from the time the marine laborers board the ship on Monday until they leave on Friday, they eat and sleep aboard in order to accomplish their assigned task. The ships are on a continuous twenty-four-hour, year-round ferry schedule.

16. In order to obtain food aboard ship, the marine laborers must sign meal chits and turn them over to the ship's cook in order to obtain food. These meal chits are then forwarded to the marine office in Ludington for further handling. The other persons working aboard defendant's vessels are not required to sign meal chits for their food.

17. The marine laborers are paid on a separate payroll maintained and prepared in the marine offices on shore by Samuel R. Stock. Other persons aboard the ship are paid from the ship's payroll, prepared by department heads on the ship. For the most part, payroll checks are picked up at the marine office by all personnel, although sometimes checks are brought aboard the ship and distributed by the purser.

18. All persons aboard the ship except the marine laborers work twenty

continuous days aboard ship on twenty-four-hour call, making all the voyages the ship makes during this period, followed by eight days off.

19. The ship's captain, chief engineer, and steward, and the marine laborers aboard ship are not paid on an overtime basis. All other persons aboard ship are paid on an overtime basis.

20. All persons aboard ship, except the marine laborers, may draw advances on their pay checks; the marine laborers, as a usual rule, may not.

21. Ships of defendant's Lake Michigan fleet carry both freight and passengers in interstate commerce.

22. Plaintiff was employed as a marine laborer on April 17, 1950, and was one of the four additional marine laborers referred to in 6 above. From the date plaintiff was hired until the day of the alleged accident plaintiff made the following voyages on defendant's vessels to fulfill the tasks to which he had been assigned:

| Steamer | Month | Dates |
|---|---|---|
| No. 41 | April | 16, 17, 26, 27, 28 |
| No. 21 | " | 19, 20, 21, 24, 25 |
| No. 32 | May | 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 22, 23 |
| No. 41 | " | 24, 25, 26, 31 |
| No. 41 | June | 1, 2, 3, 5, 6, 7, 8, 9, 12, 13, 14, 15, 16, 19, 20, 21, 22, 23, 27, 28, 29, 30 |
| No. 32 | " | 26 |
| No. 22 | July | 5, 6, 7, 8, 17, 18, 19, 20, 21, 24, 25, 26, 27, 28, 31 |
| No. 32 | " | 10, 11 |
| No. 31 | " | 12, 13, 14 |
| No. 22 | August | 1, 2, 3, 4, 8, 9, 10, |
| No. 41 | " | 11, 16, 17, 18, 22, 23, 24, 28, 29, 30, 31 |
| No. 41 | September | 1, 5, 6, 7, 8, 11, 12, 13, 14, 15, 19, 20, 21, 22, 25, 26, 27, 28, 29 |
| No. 41 | October | 2, 3, 4, 5, 6, 9, 10, 11, 12 |

23. On August 24, 1950, plaintiff joined marine laborers Frank Borema, Frank Madsen, Roland Johnson, and Richard Hodges, who had already been assigned to cleaning and painting aboard ship the City of Midland, Steamer No. 41.

24. Plaintiff did no other work than chipping, washing, and painting above decks on the City of Midland, Steamer No. 41, from August 24, 1950, until the date of the alleged injury.

25. Samuel R. Stock, foreman, assigned Richard Hodges as the marine laborer in charge of the above-mentioned marine laborers.

26. On October 12, 1950, persons, other than the above-mentioned laborers, working aboard the City of Midland, Steamer No. 41, were as follows:

Mates Department (20 names and titles omitted)

Engineers Department (21 names and titles omitted)

Stewards Department (18 names and titles omitted)

27. Plaintiff was allegedly injured on October 12, 1950, at about 8:30 a. m., aboard defendant's ship City of Midland, Steamer No. 41.

28. At the time of the alleged injury the ship was on a scheduled voyage from Milwaukee to Ludington and was located approximately midway between the two ports.

29. Plaintiff was not admitted to the Marine Hospital in Ludington, for he carried no marine or seaman's card, or continuous discharge book.

30. It is stipulated by and between the parties hereto that the foregoing agreed facts are submitted to the Court for decision upon the question of whether or not plaintiff's status is such as to entitle him to a cause of action under the Jones Act, 46 U.S.C.A. § 688. It is further agreed that additional facts may be submitted by agreement of the parties or upon request of the Court either at the Court's own request or upon suggestion of counsel.